IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| **ELIZABETH C. BIRCH,** | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 04 C 7285 |
| | ) | |
| **ILLINOIS BONE & JOINT** | ) | Judge Ronald A Guzmán |
| **INSTITUTE, LTD.,** | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Elizabeth C. Birch has sued Illinois Bone & Joint Institute, Ltd. ("IBJI") for sex discrimination in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* Before the Court is IBJI's motion for summary judgment. For the reasons provided in this Memorandum Opinion and Order, the Court grants the motion.

### Facts[1]

On February 5, 1999, Birch began working part-time for defendant IBJI as an X-ray assistant/dark room technician in its Center for Orthopedic Surgery ("COS") division. (Def.'s LR56.1(a)(3) Stmt. ("Def.'s LR56.1(a)(3)") ¶¶ 2, 18, 73.) IBJI[2] is a group of medical practices

---

[1] Unless otherwise noted, the following facts are either undisputed or deemed admitted because the party's response failed to comply with Local Rule 56.1, which this Court strictly enforces.

[2] IBJI has several business divisions, the largest of which is the COS. (Def.'s LR56.1(a)(3) ¶ 17.) In 2004, IBJI created the Physicians Management Committee ("PMC") to run the COS division. (*Id.* ¶ 24.) During Birch's tenure, the PMC consisted of Drs. Wayne Goldstein, Jeff Butler, Gerald Eisenberg, Thomas Gleason, Matthew Jimenez, Jeff Visotsky, Craig Williams, as well as non-physicians David Wold, Cheryl Mahoney, Jay Sanders and Maureen Zizzo. (*Id.* ¶ 27.) Only the PMC's physician members have voting rights. (*Id.* ¶ 28.) The PMC establishes and implements COS'

that operate under the same corporate identity. (*Id.* ¶ 1.) IBJI outsources many of its administrative functions to Healthcare Information Services ("HIS"), a limited liability corporation in the business of health care consulting and administration that generates fifty percent of its revenues by providing services to IBJI.[3] (*Id.* ¶¶ 34, 36.)

In April 2003, IBJI promoted Birch to Purchasing Coordinator, a full-time supply purchasing position. (*Id.* ¶ 72; Pl.'s LR56.1(b)(3)(C) Stmt. ("Pl.'s LR56.1(b)(3)(C)") ¶ 163.) As Purchasing Coordinator, Birch reported to Maureen Zizzo, Administrator. (Pl.'s LR56.1(b)(3)(C) ¶ 159.)

After Birch's promotion, she began handling the purchasing of medical supplies for IBJI's offices in Des Plaines and Morton Grove, the Gottlieb Hospital office and various satellite clinics. (*Id.* ¶ 72.) During her tenure, Birch never established any formal ordering procedures for ordering COS' medical supplies. (*Id.* ¶ 76.) On February 5, 2004, Zizzo rated Birch's performance as a three on a five-point scale, indicating that Birch had met IBJI's basic requirements. (Pl.'s LR56.1(b)(3)(C) ¶¶ 167-68.)

In 2003, at a IBJI shareholder meeting, IBJI's management set a goal to expand group purchasing resources. (Def.'s LR56.1(a)(3) ¶ 50.) The management committee recognized a need to standardize product and lower inventory in order to reduce overhead and establish group

---

goals and direction, which are often based on the recommendations of Dr. Goldstein and David Wold. (*Id.* ¶ 25.) In 2004, Dr. Goldstein had an ownership interest in both IBJI and Healthcare Information Services . (*Id.* ¶ 31.)

[3]Mahoney is the President and Chief Operating Officer ("COO") of HIS. (*Id.* ¶ 37.) Wold is employed by HIS as its Chief Executive Officer ("CEO"). (*Id.* ¶ 38.) Wold also serves as IBJI's contracted Chief Operating Officer ("COO"), and IBJI pays HIS for Wold's services. (*Id.* ¶ 21.) Wold advises the PMC in his capacity as IBJI's COO. (*Id.* ¶ 29.) Mahoney advises the PMC as HIS' COO and addresses any issues regarding the functions which COS has outsourced to HIS. (*Id.* ¶ 30.)

purchasing for all of the IBJI sites. (*Id.* ¶ 53; Pl.'s Ex. E, Zizzo Dep. 55.) Wold stated that he felt there was noone employed at either HIS or IBJI who was qualified to lead the purchasing system he envisioned. (Def.'s LR56.1(a)(3) ¶ 51.) Zizzo had informed Wold that Birch had not developed internal controls, protocol or policies to control inventory throughout COS. (*Id.* ¶ 52.) In July or August 2004, the PMC decided to outsource COS' inventory control and purchasing services to HIS. (*Id.* ¶¶ 51, 54.)

Around August or September 2004, IBJI began outsourcing its purchasing and inventory control services to non-party HIS. (*Id.* ¶¶ 188, 196; Pl.'s Ex. P, Wold Dep. at 19; Def.'s LR56.1(a)(3) ¶¶ 34-36.) At that time, Birch began working with William Whelehan, HIS' Director of Purchasing Services. (Pl.'s LR56.1(b)(3)(C) ¶ 197.) Whelehan's duties included centralizing purchasing procurement, negotiating volume discounts, using an electronic data base and structuring staffing for inventory control. (*Id.* ¶ 194.)

In late August or early September, Whelehan states that he told Birch not to sign a revised contract with Caligor for medical supplies, and Birch recalls that Whelehan told her that he wanted to review it. (*Id.* ¶ 201; Pl.'s Ex. H, Whelehan Dep. 25, 35; Pl.'s Ex. A, Birch Dep. 220.) On August 26, 2004, Birch signed the contract without informing Whelehan or giving him an opportunity to review it. (Def.'s LR56.1(a)(3) ¶ 107.) Birch says that she signed the revised contract because she believed it would save IBJI money and she was angry that Zizzo would not look at it. (Def.'s Ex. J, Birch Dep. at 220-21.) Birch stated that a Caligor representative had told her that the contract was just a formality and could be terminated at any time. (Def.'s LR56.1(a)(3) ¶ 110.) Whelehan was upset when he found out and informed Zizzo that he did not want to be "the guardian of a contract [he] didn't sign and have to deal with [the] consequences." (*Id.* ¶ 108.)

3

In August 2004, Whelehan realized he would need assistance so he asked that the position of Inventory Control/Buyer be created, and HIS approved it. (*Id.* ¶ 122.) Whelehan's first choice for the position did not work out because the candidate, who was male, demanded too high of a salary. (*Id.* ¶ 124.) Whelehan then contacted David Hammond, with whom Whelehan had worked previously, to determine whether he was interested in the position. (*Id.* ¶¶ 125-26.) Hammond had worked for the Burrows Company, where he ordered and received supplies, established and maintained par levels, established a process to check and remove expired supplies and equipment, used spreadsheets to track inventory and adjust to changing demand and discontinued supplies, followed up on missing shipments and back orders and worked with hospital staff and vendors to adjust par levels with changes in demand or preferences. (*Id.* ¶ 128.) Whelehan conducted three interviews with Hammond before Whelehan offered him, and Hammond accepted, the Inventory Control/Buyer position at HIS. (*Id.* ¶ 131.) Whelehan did not consider Birch for the position because he already had another candidate, Hammond, in mind and he felt that Birch's signing of the Caligor contract "verged on insubordination." (*Id.* ¶ 130.)[4]

On September 29, 2004, Birch met with Charles Henry, the Human Resources Administrator for IBJI and HIS, at IBJI's corporate office. (*Id.* ¶ 117.) Henry informed Birch that her position had been outsourced to HIS. (*Id.*)

---

[4]Although Birch objects to this fact statement because she feels it does not properly reflect Whelehan's deposition testimony, the Court disagrees, finds it accurate, and overrules the objection. There being no other basis for Birch's objection, the Court deems this fact statement admitted.

On October 15, 2004, Birch filed a charge of discrimination with the EEOC. (*Id.* ¶ 139.) On October 29, 2004, Birch received a right-to-sue letter from the EEOC. (Compl. ¶ 6.) Birch then timely filed the instant suit. IBJI has moved for summary judgment.

## **Discussion**

Summary judgment is proper if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56; *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). In deciding a motion for summary judgment, the court must construe all facts and reasonable inferences in the light most favorable to the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

IBJI moves for summary judgment on two grounds: (1) Birch's claim fails because IBJI and HIS cannot be treated as a single employer; and (2) in the alternative, Birch has failed to establish a genuine issue as to a material fact regarding a *prima facie* case of discrimination and pretext. The Court holds that based on the undisputed facts in the record, IBJI cannot be held liable for the conduct of HIS, a non-party. Even if the Court were to conclude that IBJI could be held liable for HIS' conduct, Birch has failed to raise a genuine issue as to a material fact regarding whether HIS discriminated against her based on sex when it hired Hammond instead of her for the Inventory Control/Buyer position.

## I. Whether IBJI May Be Held Liable for HIS' Hiring of Hammond

IBJI argues that it cannot be held liable for HIS' hiring of Hammond for the position of Inventory Control/Buyer. There are three situations in which a corporation may be found liable under Title VII for the discriminatory acts of its affiliates.[5] *Papa v. Katy Indus., Inc.*, 166 F.3d 937, 940-41 (7th Cir. 1999). The Court addresses each in turn.

The first situation is where the traditional conditions for piercing the corporate veil exist, thus rendering the parent or the affiliates of the plaintiff's employer liable for the employer's "statutory torts created by federal antidiscrimination law." *Id.* A plaintiff must show two things to pierce the corporate veil of an affiliate corporation: (1) "there must be such unity and ownership [between the affiliate and parent corporation] . . . that the separate personalities . . . no longer exist;" and (2) "circumstances must be such that adherence to the fiction of separate corporate existence would sanction a fraud or promote injustice." *Worth v. Tyer II*, 276 F.3d 249, 259-60 (7th Cir. 2001) (quotation omitted). Illinois courts focus on four factors to determine whether a corporation is so controlled by another to justify disregarding their separate entities: "(1) the failure to maintain adequate corporate records or to comply with corporate formalities, (2) the commingling of funds or assets, (3) undercapitalization, and (4) one

---

[5]Although the Seventh Circuit has never specifically defined what an affiliate is, Black's Law Dictionary (8th ed. 2004) defines "affiliate" as "a corporation that is related to another corporation by shareholdings or other means of control; a subsidiary, parent, or sibling corporation." Under this definition, IBJI and HIS are affiliates because there is some relation between the corporations by shareholdings. In 2004, Goldstein owned some interest in both IBJI and HIS. (Pl.'s LR56.1(b)(3)(B) Stmt. ("Pl.'s LR56.1(b)(3)(B)") ¶ 31.) There is also a relation between the two corporations through control because employees of both corporations are members of IBJI's PMC and employees of each corporation held positions at the other corporation.

6

corporation treating the assets of another corporation as its own." *Sea-Land Serv., Inc. v. Pepper Source*, 941 F.2d 519, 521 (7th Cir. 1991) (quotation omitted).

Birch has failed to create a triable issue as to whether the corporate veil should be pierced in this case. IBJI and HIS charge each other for the use of each other's employees' services, and both have invoices that reflect those charges. There is no evidence of commingling of funds or assets. Neither corporation appears to be undercapitalized or to be treating the assets of the other corporation as its own. To pierce the corporate veil between IBJI and HIS would therefore be inappropriate.

The second situation in which a corporate affiliate may be held liable for the acts of another is where "an enterprise might split itself up into a number of corporations, each with fewer than the statutory minimum number of employees, for the express purpose of avoiding liability under the discrimination laws." *Papa*, 166 F.3d at 941. There is no evidence of this being the case because both IBJI and HIS easily satisfy the statutory minimum number of employees to be liable under the discrimination laws.

The third situation is where the affiliate corporation "directed the discriminatory act, practice, or policy of which the employee" is complaining. *Papa*, 166 F.3d at 941. This case is unique in that IBJI terminated her and HIS hired a man instead of her for the replacement position. However, Birch only complains about the latter. (Def.'s LR56.1(a)(3) 141.) For the third situation to apply in this case, and therefore make IBJI potentially liable for HIS' alleged discrimination, Birch must establish that IBJI directed HIS to hire Hammond instead of Birch.

It was IBJI's PMC that decided to outsource Birch's job responsibilities. (Pl.'s LR56.1(b)(3)(B) ¶ 53.) It was Zizzo, an IBJI employee, who told Wold, an influential member of the PMC, about her concerns regarding IBJI's purchasing and management of supplies.

7

(Def.'s LR56.1(a)(3) ¶ 52.) However, there is no evidence that IBJI directed or influenced Whelehan's decision to hire Hammond instead of Birch. In fact, Zizzo asked Whelehan to consider Birch for the position and forwarded Birch's resume and performance appraisals to Whelehan. (Pl.'s LR56.1(b)(3)(C) ¶ 214.) Because the record does not contain any evidence that IBJI directed the acts of HIS, IBJI cannot be held liable for HIS' decision to hire Hammond instead of Birch.

In sum, Birch has failed to create a triable issue of material fact as to whether IBJI may be found liable under Title VII for the allegedly discriminatory acts of HIS. Accordingly, the Court grants IBJI's motion for summary judgment.

**II. Whether a Genuine Issue of Material Fact Exists as to Birch's Sex Discrimination Claim**

Even if the Court were to conclude that IBJI may be held liable for the acts of HIS, which it does not, it would still grant IBJI's motion for summary judgment. Thus, hypothetically speaking, for this portion of the Memorandum Opinion and Order, the Court treats the two entities as one.

Title VII prohibits employers from treating an employee less favorably with respect to terms and conditions of employment because of her sex. *Oest v. Ill. Dep't of Corr.*, 240 F.3d 605, 611 (7th Cir. 2001). "In a Title VII action, the plaintiff may establish discrimination at the summary judgment stage through either the 'direct' or 'indirect' method." *Id.*

Under the direct method, plaintiff must present "evidence that, if believed by the trier of fact, would prove discriminatory conduct on the part of the employer without reliance on inference or presumption." *Cerutti v. BASF Corp.*, 349 F.3d 1055, 1060-61 (7th Cir. 2003). "Direct evidence essentially requires an admission by the decision-maker that his actions were

based upon the prohibited animus. " *Rogers v. City of Chi.*, 320 F.3d 748, 753 (7th Cir. 2003) (quotation omitted). "While the typical direct method situation is an admission of discriminatory animus by the employer, we have stated that [a] plaintiff can also prevail under the direct method of proof by constructing a convincing mosaic of circumstantial evidence that allows a jury to infer intentional discrimination by the decisionmaker." *Phelan v. Cook County*, __ F.3d __, No. 04-3991, 2006 WL 2690986, at *4 (7th Cir. Sept. 18, 2006) (quotation omitted).

There are three kinds of circumstantial evidence under the direct method that will enable a Title VII plaintiff to defeat a summary judgment motion. *Rudin v. Lincoln Land Cmty. Coll.*, 420 F.3d 712, 720-21 (7th Cir. 2005).

> The first consists of suspicious timing, ambiguous statements oral or written, behavior toward or comments directed at other employees in the protected group, and other bits and pieces from which an inference of discriminatory intent might be drawn. . . . Second is evidence, whether or not rigorously statistical, that employees similarly situated to the plaintiff other than in the characteristic (pregnancy, sex, race, or whatever) on which an employer is forbidden to base a difference in treatment received systematically better treatment. And third is evidence that the plaintiff was qualified for the job in question but passed over in favor of (or replaced by) a person not having the forbidden characteristic and that the employer's stated reason for the difference in treatment is unworthy of belief, a mere pretext for discrimination.

*Troupe v. May Dep't Stores*, 20 F.3d 734, 736 (7th Cir. 1994). However, no matter which type of circumstantial evidence is proffered, it "must point directly to a discriminatory reason for the employer's action." *Cerutti*, 349 F.3d at 1061 (quotation omitted).

Birch argues that she has provided evidence that corresponds to the first and third categories. (Pl.'s Mem. Law Opp'n Def.'s Mot. Summ. J. 6.) In support, Birch relies on the following, respectively: (1) she received performance reviews throughout her tenure that reflected that she was meeting IBJI's expectations; and (2) Whelehan stated that he did not consider her for the newly created position because he wanted to hire Hammond and that

9

Whelehan's stated reason is unworthy of belief because, in Birch's view, Hammond had less experience with medical supply ordering.

Though Birch received satisfactory performance reviews, the last review took place in February 2004 before Birch signed the revised Caligor contract without giving Whelehan an opportunity to review it, as he had instructed her to do. (Def.'s LR56.1(a)(3) ¶ 107.) It is undisputed that Whelehan did not consider Birch for the Inventory Control/Buyer position because, in his view, her conduct in signing the contract "verged on insubordination." (Def.'s LR56.1(a)(3) ¶ 130.)

Given that undisputed fact, no rational jury could find that Whelehan did not honestly believe that Birch was unqualified for the new position. Further, although Hammond had less years of experience than Birch (*id.* ¶ 72; Pl.'s LR56.1(b)(3)(B) ¶ 127), it is undisputed that he had more experience with developing inventory controls and processes than Birch. In his prior job, Hammond, among other things, established a process to check and remove expired supplies and equipment and used spreadsheets to track inventory and adjust to changing demand and discontinued supplies, whereas Birch, according to her supervisor, had not developed internal controls, protocol or policies to control inventory. (Def.'s LR56.1(a)(3) ¶¶ 52, 128.) In sum, Birch has failed to provide any evidence to support that Whelehan's reasons for the difference in his treatment of her and Hammond are unworthy of belief. Accordingly, Birch's circumstantial evidence does not allow her to defeat summary judgment under the direct method. Her proffered facts fail to create a convincing mosaic of circumstantial evidence that would permit a jury to infer that she was subject to intentional discrimination based on gender.

If evidence under the direct method is lacking, a plaintiff may still establish a triable issue of fact as to sex discrimination under the familiar indirect or burden-shifting method of

10

*McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). *Oest*, 240 F.3d at 612. Courts have recognized a "variety of adverse employment actions covered within the broad reach of the discrimination statutes, [and] have adapted the requirements for making a *prima facie* case in special cases to reflect the reality of the workplace." *Michas v. Health Cost Controls of Ill., Inc.*, 209 F.3d 687, 693 (7th Cir. 2000).

IBJI argues that the *prima facie* case as utilized in a mini reduction-in-force ("mini-RIF") situation should apply in this case. A mini-RIF occurs when an employee is discharged, but the terminated employee's duties are absorbed by his or her former co-workers not in the protected class. *Krchnavy v. Limagrain Genetics Corp.*, 294 F.3d 871, 876 (7th Cir. 2002). In a mini-RIF case, a plaintiff must establish the following to make a *prima facie* case: (1) she is a member of a protected class; (2) she was performing at a level that met her employer's legitimate expectations; (3) she was subject to an adverse employment action; and (4) her duties were absorbed by her former co-workers who were not members of the protected class. *Id.*

On the other hand, Birch argues that the *McDonnell-Douglas prima facie* case should apply without modification. This requires plaintiff to establish that: "(1) she is a member of a protected class; (2) she was performing at a level that met her employer's legitimate expectations; (3) she was subject to an adverse employment action; and (4) she was treated differently than a similarly situated person outside the protected class." *Id.*; *see Hague v. Thompson Distrib. Co.*, 436 F.3d 816, 821 (7th Cir. 2006).

In this case, Birch's duties were not absorbed by her former co-workers. Instead, Birch was replaced by someone who was newly hired for the Inventory Control/Buyer position that handled, among other things, Birch's duties. Thus, it would seem that Birch is correct in

11

asserting that the *prima facie* case applicable in mini-RIF situations is inappropriate in this case. However, regardless of which *prima facie* case applies, Birch fails to meet her burden.

Birch has established the first, third, and fourth elements of both *prima facie* cases. Birch is a female and therefore a member of the protected class of women. Birch suffered an adverse employment action when HIS did not hire her for the newly created position. Either her duties were absorbed by a male or she was replaced by a male.

However, Birch has failed to establish that she was performing at a level that met her employer's legitimate expectations. "[W]hat matters . . . is not the employee's past performance, but whether she was meeting the company's expectations at the time of . . . [the adverse employment action]." *Johal v. Little Lady Foods, Inc.*, 434 F.3d 943, 946 (7th Cir. 2006) (quotation omitted). This is so because "[t]he fact that an individual may have been qualified in the past does not mean [s]he is qualified at a later time." *Grohs v. Gold Bond Bldg. Prods.*, 859 F.2d 1283, 1287 (7th Cir. 1988).

Birch's last performance review prepared by Zizzo shows that she was meeting IBJI's legitimate expectations as of February 2004. (Pl.'s LR56.1(b)(3)(C) ¶¶ 167-68.) On May 21, 2004, Zizzo even approved a three percent pay increase for Birch based on Birch's job performance. (*Id.* ¶ 180.) On June 4, 2004, Zizzo again increased Birch's salary in order to bring Birch's compensation in line with other positions in the practice. (*Id.* ¶ 182.)

However, as discussed above, in late August or early September 2004, Whelehan, HIS' Director of Purchasing Services, told Birch that he wanted to review a revised contract with Caligor for medical supplies before Birch signed it. (*Id.* ¶ 201.) On August 26, 2004, Birch signed the contract without informing Whelehan or giving him an opportunity to review it. (Def.'s LR56.1(a)(3) ¶ 107.) It is undisputed that Whelehan was upset when he found out and

12

stated that he did not want to be "the guardian of a contract [he] didn't sign and have to deal with [the] consequences." (*Id.* ¶ 108.) It is also undisputed that Whelehan did not consider Birch for the Inventory Control/Buyer position because, in his view, her conduct "verged on insubordination." (*Id.* ¶ 130.)

The undisputed facts in the record show that at the time of her termination, Birch was not performing at a level that met her employer's legitimate expectations due to her signing the Caligor contract without informing Whelehan or giving him an opportunity to review it as he instructed her to do. Accordingly, she cannot establish this necessary element of her *prima facie* case, and the Court need not address IBJI's arguments that Birch's performance was lacking in other respects.

Further, even if Birch could make out a *prima facie* case, her sex discrimination claim would still fail. "[O]nce a plaintiff establishes a *prima facie* case of discrimination, the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for the adverse action . . . ." *Krchnavy*, 294 F.3d at 876. If the employer offers a nondiscriminatory reason, "the plaintiff then bears the ultimate burden of showing that it is a pretext for discrimination." *Id.*

HIS' proffered nondiscriminatory reasons for hiring Hammond instead of Birch for the Inventory Control/Buyer position are Whelehan's: (1) familiarity with Hammond based on their prior working relationship and (2) displeasure with how Birch handled the Caligor contract. (Pl.'s LR56.1(b)(3)(B) ¶¶ 125-26, 130.) HIS has satisfied its burden of production, and thus Birch must bear the ultimate burden of showing that IBJI's reasons are a pretext for discrimination.

"Pretext means more than a mistake on the part of the employer; pretext 'means a lie, specifically a phony reason for some action.'" *Wolf v. Buss (Am.), Inc.*, 77 F.3d 914, 919 (7th

13

Cir. 1996) (quoting *Russell v. Acme-Evans Co.*, 51 F.3d 64, 68 (7th Cir. 1995)). "The mere fact that the employer acted incorrectly or undesirably, however, cannot adequately demonstrate pretext; rather, the employee must prove that the employer did not honestly believe the reasons it gave for the [adverse employment action]." *Tincher v. Wal-Mart Stores, Inc.*, 118 F.3d 1125, 1130 (7th Cir. 1997). "Pretext may be proven with evidence that the defendants' stated reasons for an employment action were factually baseless, were not the actual motivation for the adverse employment action, or were insufficient to motivate the adverse employment action." *Mullin v. Gettinger*, 450 F.3d 280, 286 (7th Cir. 2006).

Plaintiff argues that the following facts raise a triable issue as to pretext: (1) outsourcing purchasing and inventory control to HIS has not resulted in cost savings to IBJI, and (2) Whelehan failed to consider her for the Inventory Control/Buyer position, considered two male candidates for the position and hired a less-qualified, male candidate. The Court disagrees.

The first argument, that IBJI's outsourcing of her duties was ultimately not cost-effective and thus a pretext for discrimination, is unsupported by the record. Birch has not provided any evidence that in July or August 2004 or at the time of her termination, IBJI did not honestly believe that outsourcing its purchasing and inventory control functions to HIS would address purchasing inefficiencies. (*Id.* ¶¶ 50, 53-54.) It is undisputed that IBJI's management committee set a goal to expand group purchasing[6] resources and to standardize product and lower inventory in order to reduce overhead. (*Id.* ¶¶ 50, 53; Pl.'s Ex. E, Zizzo Dep. 55.) Birch provides absolutely no basis for comparing overhead costs related to her limited role within COS

---

[6]Group purchasing organizations contract directly with vendors collectively on behalf of several medical practices and, in exchange for volume, give preferred pricing, hold inventory and guarantee that it can be shipped the next day, rather than the client or physician carrying the inventory costs. (Pl.'s Ex. C, Wold Dep. 73.)

14

versus HIS' new expanded role in inventory control and purchasing services for all IBJI sites, including the Morton Grove office that opened in October 2004 as well as seven additional non-COS offices. (Def.'s LR56.1(a)(3) ¶¶ 133, 138.) The Court is mindful that "it is not our role to question the wisdom of a company's decisions on how to run its business, only to assure that such decisions are not intended to provide cover for illegal discrimination." *Johal*, 434 F.3d at 946-47.

Further, Birch has failed to create a triable issue of fact as to whether Whelehan's reasons for failing to consider her for the Inventory Control/Buyer position, considering two male candidates, and hiring Hammond are lies. She admits she signed the Caligor contract without informing Whelehan or giving him an opportunity to review it, despite Whelehan's instructions that he wanted to review it first.[7] (Def.'s LR56.1(a)(3) ¶ 107; Pl.'s LR56.1(b)(3)(C) ¶¶ 201-03; Pl.'s Ex. H, Whelehan Dep. 28, 35; Pl.'s Ex. A, Birch Dep. 220.) Simply put, that Whelehan considered two male candidates and hired one of them does not raise a genuine issue of fact as to whether he genuinely believed that Birch was not qualified for the new position due to her conduct that in his view came close to insubordination. Given the undisputed facts in the record, no rational jury could find that HIS' reasons are a pretext for sex discrimination.

---

[7]That Whelehan at one point in his deposition stated that he told Birch that he did not want her to sign the contract in "late August or early September . . . probably" and in another point in his deposition that he did so in mid-September, is insufficient to create a genuine issue of fact as to his credibility. *See Roger Whitmore's Auto. Servs., Inc. v. Lake County, Ill.*, 424 F.3d 659, 667 (7th Cir. 2005) ("The nonmoving party must offer something more than a "scintilla" of evidence to overcome summary judgment, and must do more than simply show that there is some metaphysical doubt as to the material facts." (citation and quotation omitted)).

In sum, the Court holds that Birch has failed to create a genuine issue of material fact as to her sex discrimination claim. Accordingly, the Court grants IBJI's summary judgment motion and hereby terminates this case.

**Conclusion**

For the foregoing reasons, the Court grants IBJI's motion for summary judgment [doc. no. 25-1]. This case is hereby terminated.

**SO ORDERED**  ENTERED: 9/28/06

*Ronald A. Guzman*
_____

**HON. RONALD A. GUZMAN**
**United States Judge**